## Mark Flomenbaum *vs.* Commonwealth & others.[1]

Suffolk. May 7, 2008. - July 9, 2008.

Present: Marshall, C.J., Greaney, Ireland, Spina, Cowin, Cordy, & Botsford, JJ.

*Governor. Public Employment,* Removal. *Commonwealth,* Officers and employees. *Office of the Chief Medical Examiner. Contract,* Employment. *Words,* "For cause."

This court, in reviewing the decision of the Governor to remove the chief medical examiner of the Commonwealth "for cause" under G. L. c. 30, § 9, concluded that § 9 permits the Governor to remove the chief medical examiner, as the head of an office squarely within the operations and under the control of the executive branch, on a general finding of poor performance that includes, among other things, neglect of duty, incompetence, inefficiency, or poor supervision, and does not require proof of misfeasance, malfeasance, or wilful neglect of duty [745-747]; further, this court concluded that the "arbitrary and capricious" standard of review applies to a court charged with determining whether the Governor's removal of such a public official "for cause" under G. L. c. 30, § 9, is justified [747].

The Governor's decision to remove the plaintiff, the chief medical examiner of the Commonwealth, from office "for cause" under G. L. c. 30, § 9, was neither arbitrary nor capricious, as it was sufficiently supported by evidence of serious problems concerning the performance of the plaintiff's administrative and managerial duties, and by evidence of a critical lack of effective oversight, including written procedures and protocols, at the plaintiff's office. [747-750]

A letter of agreement signed by the Secretary of Public Safety and the plaintiff, who was later appointed chief medical examiner of the Commonwealth, did not operate to bar the Governor's removal of the plaintiff from office, where the letter stated on its face that the plaintiff's tenure as chief medical examiner was governed by G. L. c. 30, § 9, which provided that the plaintiff's tenure in office could be cut short at any time "for cause." [750-752]

Statement that the Governor clearly has authority, in the absence of statutory or other provision to the contrary, to enter into agreements that would, effectively, bind or constrain gubernatorial administrative, or managerial, discretion in the future. [753]

Civil action commenced in the Superior Court Department on August 31, 2007.

[1]The Governor and the Secretary of Public Safety, in their official capacities.

Following transfer of the case to Supreme Judicial Court for the county of Suffolk, the case was reported by *Botsford*, J.

*Thomas R. Kiley* (*Garrick F. Cole* with him) for the plaintiff.

*Thomas A. Barnico*, Assistant Attorney General (*James A. Sweeney*, Assistant Attorney General, with him) for the defendants.

*Stephen V. Miller*, for National Association of Medical Examiners, amicus curiae, submitted a brief.

GREANEY, J. The plaintiff, Dr. Mark Flomenbaum, challenges the decision of Governor Deval L. Patrick to remove him from office as chief medical examiner of the Commonwealth, effective August 1, 2007. In an amended complaint filed in the Superior Court against the Commonwealth, the Governor, and the Secretary of Public Safety (Secretary) (together, the Commonwealth), the plaintiff sought damages for breach of contract (counts one through five) and wrongful removal (counts six through eleven). In addition to damages, the plaintiff sought an order vacating the Governor's decision and mandamus restoring him to office (count twelve). A single justice of this court allowed the Commonwealth's motion, filed pursuant to G. L. c. 211, § 4A, to transfer the case to the county court. There, the Commonwealth moved to dismiss counts one through five of the plaintiff's second amended complaint, pursuant to Mass. R. Civ. P. 12 (b), 365 Mass. 754 (1974), and, in answer to claims six through twelve of the second amended complaint, the Commonwealth filed the record of the proceedings before the Governor in connection with the plaintiff's dismissal. The Commonwealth then filed a motion for judgment on the pleadings on counts six through twelve, pursuant to Mass. R. Civ. P. 12 (c), 365 Mass. 754 (1974). The single justice reserved and reported the Commonwealth's motions, without decision, to the full court. The parties have submitted proposed questions, which we rephrase for clarity as follows:

> 1. a. Whether a Governor may remove a chief medical examiner from office "for cause," under G. L. c. 30, § 9, in the absence of proof of misfeasance, malfeasance, or wilful neglect of duty?
>
> b. Whether the proper standard by which a reviewing

court evaluates a Governor's decision to remove a chief medical examiner from office "for cause" is whether some evidence in the record before the Governor supported his decision, that is, whether the decision was not arbitrary or capricious?

c. Whether that standard has been met in the circumstances of this case?

2. Assuming that the January 21, 2005, letter of agreement, signed by the plaintiff and the (then current) Secretary, constitutes an employment contract, are the terms of that contract enforceable in the circumstances of this case?

We answer all parts of question one in the affirmative and question two in the negative. We now explain why, first deciding the Commonwealth's motion for judgment on the pleadings, because resolution of that motion in the Commonwealth's favor will have a substantial effect on the motion to dismiss, which will also be resolved in the Commonwealth's favor.

1. A motion for judgment on the pleadings, under rule 12 (c), is a challenge to the legal sufficiency of a complaint. See *Jarosz* v. *Palmer*, 436 Mass. 526, 529 (2002), quoting J.W. Smith & H.B. Zobel, Rules Practice § 12.16 (1974) (rule 12 [c] motion is "actually a motion to dismiss . . . [that] argues that the complaint fails to state a claim upon which relief can be granted"). "For purposes of the court's consideration of the [rule 12 (c)] motion, all of the well pleaded factual allegations in the adversary's pleadings are assumed to be true and all contravening assertions in the movant's pleadings are taken to be false." *Minaya* v. *Massachusetts Credit Union Share Ins. Corp.*, 392 Mass. 904, 905 (1984), quoting 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1368, at 691 (1969). Judgment on the pleadings may be entered if a plaintiff fails to present sufficient facts in the complaint to support the legal claims made. For purposes of deciding the Commonwealth's motion, we accept as true the following factual assertions contained in the plaintiff's second amended complaint.

The plaintiff is a physician registered to practice medicine in the Commonwealth. He is board certified in anatomical and for-

ensic pathology and also holds a doctorate in neuroscience. Governor Mitt Romney appointed the plaintiff to the office of chief medical examiner on January 21, 2005, pursuant to G. L. c. 38, § 2.[2] This appointment followed an aggressive recruitment process necessitated by chronic shortcomings in the office of the chief medical examiner (OCME). The Governor, the Secretary (then Edward Flynn), the undersecretary of forensic services (undersecretary), and members of the commission on medicolegal investigation (CMI)[3] were involved in the plaintiff's recruitment and appointment.

On January 21, 2005, the plaintiff and the Secretary signed a letter, drafted by the undersecretary, which embodied the terms on which the plaintiff's acceptance of the appointment would be conditioned. The letter states that its purpose is "to confirm our mutual understanding regarding the commitment of the Commonwealth to support and advocate for the changes you envision for the reform and recovery of the [OCME] and your commitment to restore the integrity and reputation of the office by professionalizing the medicolegal services the OCME provides to the public." The letter lists major focus areas of concern within the OCME that would require: (1) "an increase in the number of medical examiners necessary to handle the cases within the jurisdiction of the OCME"; (2) "the development of a comprehensive medicolegal investigation system within the OCME"; (3) "[a]ccreditation under [national] standards"; and (4) "[t]he improvement or replacement of [medical examiner] facilities so that all are accreditable." The letter states an understanding that "it will take approximately [three to five] years to achieve these

[2]General Laws c. 38, § 2, establishes the office of chief medical examiner, under the supervision and control of the chief medical examiner, and within the executive office of public safety. The statute sets forth professional qualifications for the position of chief medical examiner and provides that "the chief medical examiner shall be appointed by the governor for a term of five years from among a list of not less than three nominees recommended by the commission on medicolegal investigation" (CMI).

[3]The CMI is organized under G. L. c. 6, § 184, and is "in the executive office of public safety." Its members are the "attorney general, the secretary of public safety, the commissioner of public health or their designees, and thirteen persons to be appointed by the governor." Id. According to facts alleged in the plaintiff's second amended complaint, the CMI evaluated eligible candidates for the position of chief medical examiner and recommended the plaintiff alone for appointment.

goals." The letter further provides that the Executive Office of Public Safety (EOPS) "will support [the plaintiff] in the establishment and promotion of changes to current policies and practices" and that the Secretary looked forward to working with the plaintiff. The letter expressly states that the plaintiff's appointment is governed by G. L. c. 38, § 2, and G. L. c. 30, § 9. The letter was delivered to Governor Romney, who (the plaintiff alleges) ratified its provisions when he appointed the plaintiff to office. The plaintiff's five-year term of office began on April 25, 2005.

On May 3, 2007, the current Secretary (Kevin M. Burke) placed the plaintiff on paid administrative leave and denied him access to the OCME. On June 7, the plaintiff received written notice from the Governor (now Governor Patrick) of his decision to initiate removal proceedings against him "for cause," in accordance with G. L. c. 30, § 9.[4] In the letter, the Governor referred to what he termed "fundamental operational [and] administrative failures" of the OCME during the prior three months, including a substantial backlog of bodies; one case of a missing body; the OCME's failure to meet public health and occupational safety standards; and the plaintiff's "lack of candor with the administration."

The Governor conducted a hearing on the charges on July 27, 2007. The hearing lasted approximately one hour. In a letter dated August 1, 2007, the Governor informed the plaintiff that he was being removed from office "for cause," effective immediately. The Governor acknowledged in the letter that no question had been raised as to the plaintiff's excellent reputation as a pathologist,[5] but stated that there had been "serious problems concerning the performance of [the plaintiff's] administrative and

---

[4]General Laws c. 30, § 9, provides:

"Unless some other mode of removal is provided by law, a public officer, if appointed by the governor, may at any time be removed by him for cause, and, if appointed by him with the advice and consent of the council, may be so removed with its advice and consent."

[5]We join the Governor in the assessment of the plaintiff's medical credentials. Those credentials, and his curriculum vitae, establish excellent competency in the areas in which he practices and has skills. In the public sector, however, collision can occur between the professional competency of the public official involved and the official's administration of a difficult job, such that the provisions of G. L. c. 30, § 9, are called into play. When such a collision occurs,

managerial duties at the [OCME], most prominently [his] unacceptable handling of the missing body situation." The Governor continued that the plaintiff himself had "candidly acknowledged several operational and administrative failures at the OCME for which [the plaintiff was] responsible" and that the plaintiff's failure to exercise effective management and supervision of the OCME, and the "particular operational failures that have been identified in the record, [left him] without confidence in [the plaintiff's] ability to effectively perform the necessary functions of the office."

a. The parties agree that the plaintiff is a public official subject to removal by the Governor under G. L. c. 30, § 9, "for cause." They disagree, however, on the appropriate standard by which "cause" is measured. The Commonwealth contends that § 9 permits the Governor to remove the chief medical examiner on a general finding of poor performance that includes, among other things, neglect of duty, incompetence, inefficiency, or poor supervision. The plaintiff asserts that statutory "cause" is met only by proof of misfeasance, malfeasance, or wilful neglect of duty. We agree with the Commonwealth.

Some additional statutory background will be helpful at this point. In 1992, the Legislature established the OCME as an office within the EOPS.[6] See St. 1992, c. 368, § 2. The Secretary is the executive officer of the EOPS and serves directly under the Governor, as a member of his cabinet, to carry out the duties and responsibilities of the office. See G. L. c. 6A, §§ 2, 3, 4 (Secretary "conduct[s] comprehensive planning with respect to the functions of [the EOPS] and coordinate[s] the activities and progress of the [S]tate agencies therein"). In 2004, the Legislature created the position of undersecretary of forensic services, St. 2004, c. 149, § 18, to be appointed by the Secretary, and gave the undersecretary, among other duties, responsibility for direct oversight of the "functions and administration" of the

the legal question presented is the determination of "cause" for removal, which invokes consideration by the Governor of the need for efficient and effective administration of a public office. That consideration necessarily requires evaluation of factors beyond professional competency alone.

[6] Pursuant to St. 2007, c. 19, § 3, the name of the Executive Office of Public Safety has changed to the Executive Office of Public Safety and Security. This change has no bearing on the issues before us.

OCME. G. L. c. 6A, § 18 ¹/₂. Section 18 ¹/₂ also directs the undersecretary to "conduct studies of the operations of [the OCME] and work with [the OCME] in effecting procedures and programs which promote efficiency and improvements in [its] administration."

The statutory scheme places the OCME and the chief medical examiner squarely within the operations, and under the control, of the executive branch. In *Levy* v. *Acting Governor*, 436 Mass. 736, 748-749 (2002), we recognized that what constitutes sufficient cause to remove the head (or a member) of a governmental agency from office is determined in the context of the authority of the particular agency to act as an independent body. See *id.* at 749. We differentiated between independent entities that operate more like a business than a governmental agency, and which have importance to the public that demands that they be "free from the changing winds of politics," and those agencies that have responsibilities and duties within the broad power of oversight and control of the Governor. *Id.* at 748. The statutory scheme governing this case demonstrates that the OCME is nothing like a "independent corporate body," *id.* at 749, such as the Massachusetts Turnpike Authority, at issue in the *Levy* case, in which cause to remove a member must be in the order of malfeasance, misfeasance, or wilful neglect of duty. See *id.*, citing, as examples, St. 1956, c. 465, § 2 (Massachusetts Port Authority); and St. 1984, § 372, § 3 (Massachusetts Water Resources Authority).

We conclude that the standard by which "cause" is measured in this case is the one traditionally offered as a legitimate reason for an employee's discharge: to name a few examples, any "grounds for discharge reasonably related, in the employer's honest judgment, to the needs of his business," *Amoco Oil Co.* v. *Dickson*, 378 Mass. 44, 48 (1979), quoting *G & M Employment Serv., Inc.* v. *Commonwealth*, 358 Mass. 430, 435 (1970); a dispute over policy "about which there may be an honest difference of opinion," *Rinaldo* v. *School Comm. of Revere*, 294 Mass. 167, 169 (1936); or, in the case of a public official, the Governor's "conclusion that the interests of the public require the removal of the public officer," *Murphy* v. *Casey*, 300 Mass. 232, 236 (1938); or "less than complete confidence" in a public of-

ficial's "competency and efficiency." *McSweeney* v. *Town Manager of Lexington*, 379 Mass. 794, 798 (1980).

b. The parties also disagree on the standard of review to be applied by a reviewing court charged with determining whether the Governor's removal of a public official "for cause" is justified. The Commonwealth argues that the "arbitrary or capricious" standard should apply. The plaintiff contends that the standard of review should be "substantial evidence," that is, evidence that "a reasonable mind might accept as adequate to support a conclusion." *Levy* v. *Acting Governor*, *supra* at 745, quoting G. L. c. 30A, § 1 (6). The Commonwealth's position is the correct one. In view of what has been said above with respect to the Governor's broad power of oversight over the OCME, his decision to remove a chief medical examiner from office must be accorded great deference. We conclude, therefore, that our power to override the Governor's decision, in cases such as this, is limited to decisions that we determine to be "arbitrary or capricious."

c. We now review the Governor's decision to remove the plaintiff from office to determine whether it was "arbitrary or capricious." Documents in the record demonstrate a substantial measure of favorable support for the plaintiff's professional accomplishments during his years of service to the Commonwealth, as well as recognition, by his peers, of the valuable skills and expertise the plaintiff commands in the field of forensic medicine, which may prove difficult, or impossible, for the Governor to replace. The plaintiff submitted to the Governor thirty affidavits on his behalf, all attesting to points of significant progress made in the OCME under his leadership. The question before us, however, is not whether, in our judgment, the Governor's decision was a wise one, or even whether, on balance, it was in the public interest. The question is whether the Governor's decision to remove the plaintiff from office "for cause" was arbitrary or capricious. It was not.[7]

The Governor had before him evidence and information, in

[7]We do not consider the plaintiff's claim, raised in his reply brief, that the hearing he was afforded before the Governor was constitutionally insufficient. The plaintiff was given "notice of the charges against him, an explanation of the [Governor's] evidence, and an opportunity to present his side of the story." *Cleveland Bd. of Educ.* v. *Loudermill*, 470 U.S. 532, 546 (1985). Moreover, neither the plaintiff, nor his counsel, objected at the hearing to the

the form of reports from the division of occupational safety (DOS) and the Department of Public Health (DPH), that the OCME had received substandard performance ratings on recently conducted health and safety inspections and that the hazardous workplace environment at the OCME, together with a lack of established protocol or written policies, poses numerous serious safety risks to persons working there. (To provide but two examples, the DPH found the OCME to be in violation of eleven State regulations promulgated to protect people from overexposure to radiation, and the DOS determined that OCME workers were unprotected from exposure to chemical and biological hazards in the autopsy area.) Findings and recommendations of a consulting firm hired by the EOPS to conduct an independent study of the OCME mirrored the reports of the DOS and DPH.[8]

In addition, the Secretary had provided the Governor with evidence of two recent operational failures within the OCME, which, the Secretary opined, had damaged the integrity and reputation of the office, and which could have been avoided with effective oversight by the plaintiff. Overcrowding had long plagued the OCME.[9] On March 15, 2007, it was reported in the Boston Globe that bodies overflowed the storage areas at the OCME and were being stacked in refrigerator trucks, parked outside the building, that are normally reserved for holding disaster victims. The plaintiff's initial response to the EOPS was

---

manner in which it was conducted. No procedural claim was asserted in the plaintiff's second amended complaint, nor was one included as a proposed question for this court's review in the addendum to the single justice's reservation and report.

[8]The plaintiff argued, primarily through his counsel, at the hearing that the deficiencies at the OCME were long standing and that only substantial financial, administrative, and programmatic commitments would turn the situation around. The plaintiff emphasized to the Governor that his five-year appointment to office was conditioned on the understanding that he would need at least three to five years to achieve the objectives set forth for him at that time.

[9]In September, 2006, in response to the plaintiff's urging, the EOPS promulgated emergency regulations to permit the release of unclaimed or unidentified bodies to the Department of Transitional Assistance for burial, two weeks after the body was received by the OCME (after reasonable steps were taken to identify the bodies and next of kin). See 505 Code Mass. Regs. § 2.04 (2006). The regulation went into effect on October 30, 2006. Id. From that date, until mid-March, 2007, however, the OCME had released only three or four unclaimed bodies.

that sixty cases had lingered at its facility for longer than fourteen days, either unclaimed or unidentified. Further investigation forced the plaintiff to admit that there were, in fact, over one hundred cases in that category. In a series of electronic mail messages (e-mails), the Secretary issued the plaintiff a directive charging the OCME with eliminating the case backlog. Subsequent e-mails indicate that the plaintiff was less than responsive to inquiries, made by the undersecretary, as to his progress in this assignment.

By April 25, however, the body backlog had been addressed and the facility was operating at just below capacity. On that day, OCME personnel were unable to locate a body that a forensic dentist had been assigned to work on. According to the OCME mortuary manager, it was not "uncommon in our recent practices to not be able to locate a body within the facility right awa[y], because we have had an abundance of bodies here." On Tuesday, May 1, the body still had not been located. On the morning of Wednesday, May 2, the plaintiff was informed that a body was missing and that a search had been conducted. Although the plaintiff was told that the body had been missing for one week, he did not alert the undersecretary, who was present at the OCME that morning, of the situation. The next day, when the OCME's chief administrative officer learned that the plaintiff (despite advice given to him by his legal counsel) still had not communicated with the Secretary or the undersecretary about the missing body, she did so herself. By that time, however, a funeral home and a Globe reporter had called the OCME to make inquiries about a missing body. The plaintiff acknowledged to the Governor at the hearing that his twenty-four-hour delay in communicating with the Secretary or the undersecretary was an error.[10]

We agree that the "for cause" standard in § 9 cannot be read in a vacuum, but requires assessment in the context of the reasonable expectations and demands of a particular governmental office. Even when we accept the parties' understandings memorialized

---

[10]It was discovered, later in the afternoon of May 3, that the missing body had been mistakenly released to a funeral home, on April 24, in place of another body. The mixup occurred because mortuary technicians at the OCME failed to confirm the identity of the body, by checking information contained on its "toe tag," or scanning the "toe tag" into the OCME's computer system, before releasing it for burial. The plaintiff argued before the Governor that the situation was one of "human error" for which he was not responsible.

in the January 21, 2005, letter, generally to define the standards by which the Governor would evaluate the plaintiff's performance in office, we conclude that the missing body situation, and the plaintiff's mishandling of that situation, sufficiently supports the Governor's decision to remove the plaintiff from office "for cause." Given the separate obligations and duties imposed on the chief medical examiner by legislative directive, see G. L. c. 38, § 2, it is not reasonable to suggest, as does the plaintiff, that the Governor was barred from criticizing the plaintiff's performance until three to five years had passed, or that the plaintiff's failure to meet expectations not covered within the terms of the letter could not constitute sufficient "cause" to permit the Governor to exercise his discretion, under G. L. c. 30, § 9, to remove the plaintiff from office.

The evidence before the Governor sufficiently supports his determination that there were serious problems concerning the performance of the plaintiff's administrative and managerial duties. The Governor was presented with reason to believe that the body backlog and the missing body situation (even though perhaps not directly attributable to the plaintiff's conduct) were exacerbated by the plaintiff's failure to communicate fully and frankly with his superiors at the EOPS. (The plaintiff himself concedes that the missing body situation was within his area of responsibility and that his failure to report, in a timely manner, and confer fully with the Secretary and undersecretary, was his own error.) The record also supports the Governor's conclusion that a critical lack of effective oversight, including written procedures and protocols, existed at the OCME. Because the Governor's decision has support in the record and is free from any error of law, it is not arbitrary or capricious. Judgment on the pleadings of the plaintiff's wrongful dismissal claims is warranted.[11]

2. We now take up the Commonwealth's motion to dismiss the plaintiff's contract claims under the familiar standard applicable to motions pursuant to rule 12 (b): "a complaint should

---

[11]In light of this conclusion, we need not comment on the Commonwealth's claim, raised in its motion to dismiss count twelve of the plaintiff's second amended complaint, that relief by mandamus, in these circumstances, cannot be obtained against the Governor.

not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nader* v. *Citron*, 372 Mass. 96, 98 (1977), quoting *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957).[12] In appraising the sufficiency of the plaintiff's complaint, we accept the relevant facts alleged in the complaint, as well as such inferences as may be drawn therefrom in the plaintiff's favor, as true. See *Nader* v. *Citron*, *supra*. We recite briefly those facts.

During the recruitment process, the plaintiff met with Governor Romney, who offered to appoint the plaintiff as chief medical examiner, subject to the recommendation from the CMI. The plaintiff informed Governor Romney of his need for an agreement establishing the priorities of the OCME and evidencing the administration's commitment to their achievement during the five-year term of his appointment. The plaintiff explained that the OCME was in an administrative, operational, and forensic medical crisis, that the agency's deficiencies were long standing and severe, and that substantial commitments, financial, administrative, and programmatic, were necessary to resolve the crisis and to establish a truly independent, professional office of the type necessary to meet national standards of accreditation and satisfy the State's statutory requirements. Governor Romney stated that he would make those commitments, and, at Governor Romney's direction, the plaintiff pursued further negotiation of the terms of

---

[12]In *Bell Atl. Corp.* v. *Twombly*, 127 S. Ct. 1955 (2007), the Supreme Court of the United States altered the traditional wording of the rule applicable to motions to dismiss under Fed. R. Civ. P. 12 (b) (6), set forth one-half century earlier in *Conley* v. *Gibson*, 355 U.S. 41, 45-46 (1957). The modified Federal rule is that, to survive a motion to dismiss, a complaint must contain factual allegations "enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true." *Bell Atl. Corp.* v. *Twombly*, *supra* at 1965, citing 5 C.A. Wright & A.R. Miller, Federal Practice and Procedure § 1216, at 235-236 (3d ed. 2004). See *Nguyen* v. *William Joiner Ctr. for Study of War & Social Consequences*, 450 Mass 291, 296 n.7 (2007); *Eigerman* v. *Putnam Invs., Inc.*, 450 Mass. 281, 286 n.7 (2007). The new Federal standard was recently adopted by this court, see *Iannacchino* v. *Ford Motor Co.*, *ante* 623, 625 n.7, 635-636 (2008), but we did so after the time of the filing of the Commonwealth's motion to dismiss, and the Commonwealth does not ask us to apply the stricter standard to its motion. The plaintiff's complaint would not survive a motion to dismiss considered under either standard.

his employment agreement with the Secretary and the undersecretary. The plaintiff verified with the Secretary and the undersecretary that they had the authority to negotiate the details of the agreement. During the negotiations, on several occasions, the plaintiff stated that he would in no circumstances accept the appointment unless a mutual understanding was reached concerning the problems he would face as chief medical examiner and that he absolutely would not accept the appointment if expectations for his performance were, in his judgment, unreasonable. The Secretary promised the plaintiff that his effort to lead the medical recovery of the OCME would receive the full support of the administration. Together, the parties negotiated the terms of a work plan that would produce results from three to five years after the plaintiff assumed his position as chief medical examiner.

The plaintiff's contract claims are premised on the interpretation of the Secretary's letter as an enforceable contract. The plaintiff asserts that Governor Romney intended the letter to be a written memorialization of their understanding that the difficulties that the plaintiff was undertaking to address would require a long-term effort (three to five years) and a promise, on the part of his administration, to support the plaintiff in this effort. The plaintiff further asserts that Governor Romney understood that such a contract was a prerequisite to the plaintiff's acceptance of the job offer and that his indorsement of the letter acted as a voluntary constraint on the exercise of gubernatorial discretion under G. L. c. 30, § 9.

We conclude that the plaintiff has failed to state a claim on which relief may be granted. This is so, because the contract (assuming, as the plaintiff does, that the letter is a contract) states on its face that the plaintiff's tenure as chief medical examiner is governed by G. L. c. 38, § 2 (standards for appointment), and G. L. c. 30, § 9 (standards for removal). Although the statutory standards for appointment express that the appointment would be for a term of five years, tenure in office under the provisions of G. L. c. 30, § 9, may be cut short at any time "for cause." As discussed in part 1 of this opinion, cause was sufficiently established to support the Governor's decision to remove the plaintiff from office. The Commonwealth is entitled to dismissal of the plaintiff's contract claims.

One more point is in order. In reply to the plaintiff's assertion that the January 21 letter operates as a voluntary constraint, authorized by Governor Romney, on the future exercise of gubernatorial discretion (currently, by Governor Patrick), the Attorney General argues that a Governor cannot waive legislative authority and that "enforcement of contractual obligations [contained in the letter] would conflict with the Governor's power over enforcement [of G. L. c. 38, § 2, and G. L. c. 30, § 9]." This argument may not hold true in every case. A Governor clearly has authority, in the absence of statutory or other provision to the contrary, to enter into agreements that would, effectively, bind or constrain gubernatorial administrative, or managerial, discretion in the future. Simply put, any contractual agreements in this case have been terminated, not because of the lack of gubernatorial authority to execute them, but because the parties intended, and stated, that any contractual undertakings were to operate within the statutory limitations of G. L. c. 30, § 9.

3. The Commonwealth's motion to dismiss claims one through five of the plaintiff's second amended complaint, and its motion for judgment on the pleadings as to claims six through twelve of the complaint, are allowed. This case is remanded to the county court, where judgment is to enter in favor of the Commonwealth on claims six through twelve of the second amended complaint, and where claims one through five are to be dismissed.

*So ordered.*