MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:   2018 ME 41
Docket:     Pen-17-35
Argued:     November 15, 2017
Decided:    March 22, 2018

Panel:      SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, HJELM, and HUMPHREY, JJ.

STATE OF MAINE

v.

KEITH COLEMAN

MEAD, J.

[¶1]  Keith Coleman appeals from a judgment of conviction for three counts of murder, 17-A M.R.S. § 201(1)(A) (2017), and one of gross sexual assault (Class A), 17-A M.R.S. § 253(1)(C) (2017), entered by the trial court (Penobscot County, *A. Murray*, *J.*) following a jury trial; he also appeals his sentences of life imprisonment on each of the murder counts.  *See* 15 M.R.S. §§ 2151, 2152 (2017); M.R. App. P. 20 (Tower 2016).[1]  Coleman argues that the court (1) abused its discretion by limiting his cross-examination of the State's Chief Medical Examiner, (2) clearly erred by finding that the State had sufficiently established the chain of custody of the sexual assault kit used

---

[1]  This appeal was filed before September 1, 2017; therefore, the restyled Maine Rules of Appellate Procedure do not apply.  *See* M.R. App. P. 1.

2

during the autopsy of one of the victims, and (3) applied an incorrect standard of proof and abused its discretion in determining the facts considered at sentencing. Coleman also asserts that there was insufficient evidence to support the jury's guilty verdict on the gross sexual assault charge and that the State committed prosecutorial misconduct in its opening statement. Although we conclude that the court abused its discretion by foreclosing Coleman's cross-examination of the Chief Medical Examiner concerning his termination from his position as Chief Medical Examiner in Massachusetts, the error was harmless in the face of the overwhelming evidence of Coleman's guilt. We are unpersuaded by the remainder of his arguments and affirm the judgment and sentences.

## I. FACTS

[¶2] "When viewed in the light most favorable to the jury's verdict, the record supports the following facts." *State v. Diana*, 2014 ME 45, ¶ 2, 89 A.3d 132 (alteration omitted) (quotation marks omitted). The bodies of an eight-year-old girl, her ten-year-old brother, and the children's mother were found in their home in Garland on the evening of December 20, 2014. Keith Coleman, the mother's on-and-off boyfriend of a few years, had been living

with the victims in their home for about a year prior to their deaths but was absent from the home when their bodies were discovered.

[¶3] By all reports, Coleman's and the mother's relationship was a tumultuous one, plagued by incidents of Coleman's physical abuse of the mother. Shortly before the deaths, the mother told Coleman that he needed to deal with his drinking or move out; she was also considering reconciling with her daughter's father. Coleman was very upset by this situation and told a coworker, on three different occasions, that he "wouldn't have a problem with killing them all."

[¶4] The children were last seen on December 19, 2014, as they left school on the final day of classes before Christmas vacation. On the same day, the mother made her last known communication in a text message to her aunt concerning a fight she and Coleman had that day. On the morning of December 20, shortly after 7:00 a.m., Coleman drove away from the home, then returned about five to ten minutes later, and left by 10:00 or 11:00 a.m. in the family's tan minivan. Coleman stopped at a local store for beer and cigarette rolling papers before driving to Bangor to return a remote-control car at a store, a gift he had intended to give to the son. Coleman later arranged, via direct messaging from one of his Facebook accounts, to meet up with

4

friends in Bucksport. While messaging with his friends in Bucksport, he sent another set of Facebook messages, telling another friend that he was "[o]n the run for capital murder" and asking "[c]ould you send me anything to get me to the hood."

[¶5]  During the afternoon of December 20, after repeated failed attempts to reach the mother, the aunt whom the mother had texted the previous day asked another niece to go to the home and check on the mother and the children. At around 9:00 p.m., the niece and a number of other family members arrived at the home, broke through the locked front door, and discovered the mother's body in one bedroom and the daughter's body in another; the daughter was found gagged and on her back, each leg dangling off the end of the bed on either side of one of its corners. The family members called 9-1-1 and awaited the first responders' arrival outside of the home. The first to arrive was a deputy from the Penobscot County Sheriff's Office who located the son's body in the third bedroom, underneath a pile of bedding.

[¶6]  The next morning in Bucksport, law enforcement officers responded to an apartment where Coleman reportedly had spent the previous night and took Coleman, who was cooperative, into custody. At the time of his arrest, Coleman was in possession of the family's tan minivan, the mother's

EBT card, and her purse. Coleman was interrogated that evening for five hours by two detectives; slightly over four hours into questioning, he admitted to "killing [the mother] and the kids."

[¶7] On December 21 and 22, 2014, the Medical Examiner's Office performed the victims' autopsies and concluded that the cause of death for all three was asphyxiation by ligature strangulation. During the daughter's autopsy, the Chief Medical Examiner, Doctor Mark Flomenbaum, detected no trauma to her genitals and found that her hymen was intact, but he observed blunt force trauma to her face; two superficial abrasions on her buttocks, each slightly less than an inch long; and what he suspected was dried blood in her vaginal area and on the crotch of the pink shorts she was wearing. The daughter also had a plastic shopping bag stuffed tightly into her mouth and throat, which, Dr. Flomenbaum opined, occluded the passage of all air and sound. These observations prompted either Dr. Flomenbaum or the assisting nurse, acting under his supervision, to collect four swabs from the daughter's vaginal area using a sexual assault kit. During the afternoon of December 22, the four swabs were dried and placed together in an envelope inside the kit, which was sealed and left in the Medical Examiner's Office. The sealed kit remained there until December 24 at 10:00 a.m., when the same state police

6

detective who had been present at the autopsy retrieved the kit and brought it to a temporary evidence locker and, later, to the Maine State Police Crime Laboratory for testing.

[¶8]  On December 31, 2014, a crime laboratory technician confirmed that the items of evidence delivered by the state police detective from the autopsy were contained in sealed bags, with the seals unbroken, and processed the individual items.  Two of the four swabs in the envelope labeled "vaginal swabs" as well as the stained cutting from the shorts tested positive for, and were verified as containing, blood and semen.  Samples of the vaginal swab with the highest concentration of forensic material and of the stained shorts were sent for DNA analysis.

[¶9]  Mixtures of DNA were found on the ligatures associated with the victims.  The mixture on the ligature found on the mother was consistent with the DNA profiles of Coleman, the mother, and at least one unknown donor; a ligature found on the daughter revealed DNA consistent with Coleman, the daughter, and at least one other unknown donor; on another ligature found on the daughter, there was DNA matching her and at least one unknown donor; a ligature found on the son contained DNA that was consistent with the son, the daughter, and at least one unknown donor.  A forensic DNA

analyst found that a sample from the daughter's stained shorts had too little material for DNA analysis of the sperm or blood. The vaginal swabs contained two DNA profiles—one obtained from skin cells, which was consistent with the daughter, and the other from sperm cells, which was consistent with Coleman. The DNA analyst calculated that there was a statistical possibility of less than 1 in 300 billion that the sperm fraction profile came from someone other than Coleman.

## II. PROCEDURAL HISTORY

[¶10] Coleman was initially charged by complaint with three counts of murder and later with one count of gross sexual assault and was subsequently indicted by the Penobscot County Grand Jury for those charges. 17-A M.R.S. §§ 201(1)(A); 253(1)(c). At his arraignment, Coleman entered pleas of not guilty.

[¶11] On September 13, 2015, the State moved in limine to bar Coleman from cross-examining the medical examiner, Dr. Mark Flomenbaum, concerning a Connecticut judge's finding that Dr. Flomenbaum's testimony as an expert witness for a defendant in a child death case was not credible; and, Dr. Flomenbaum's removal from his previous position as the Massachusetts Chief Medical Examiner. The court reserved ruling on the motion until

8

hearing Dr. Flomenbaum's testimony and later granted the State's motion over Coleman's repeated objection.[2]  The court found that the Connecticut court's credibility determination was not a specific instance of conduct probative of a character for truthfulness.  *See* M.R. Evid. 608(b).  The court additionally found that Dr. Flomenbaum's removal from an administrative position in Massachusetts was not only irrelevant to his medical findings in an individual autopsy but also was likely to confuse, and needlessly add to, the issues more properly before the jury; the court therefore foreclosed any cross-examination on this issue pursuant to M.R. Evid. 403.

[¶12]  On November 10, 2016, after an eleven-day trial, the jury found Coleman guilty on all charges and the court continued the matter for sentencing.  On January 19, 2017, the court imposed concurrent sentences of life imprisonment on each of the murder counts and a concurrent twenty-year term of imprisonment for the gross sexual assault.  Coleman appealed directly from his conviction, pursuant to M.R. App. P. 20 and 15 M.R.S. § 2151.  Upon his application, the Sentence Review Panel granted him leave to appeal from

---

[2]  The court referenced with approval two trial court decisions in unrelated cases that had similarly limited impeachment of Dr. Flomenbaum. *State v. Davis*, No. AROCD-CR-2013-137 Unified Criminal Docket (Aroostook Cty., August 29, 2016) (order granting motion in limine); *State v. Haji-Hassan*, CUMCD-CR-2014-7716 Unified Criminal Docket (Cumberland Cty., August 10, 2016) (order on motion for in camera review), *appeal docketed*, No. Cum-17-149 (Apr. 7, 2017).

his sentence. *State v. Coleman*, No. SRP-17-60 (Mar. 13, 2017). We consolidated our review of his sentence with his direct appeal. M.R. App. P. 20(h).

## III. DISCUSSION

A. Limitation on Coleman's Impeachment of Dr. Flomenbaum

[¶13] Prior to trial and again at trial, Coleman sought, pursuant to M.R. Evid. 608(b), to impeach Dr. Flomenbaum's character for truthfulness by inquiring on cross-examination into (1) his expert testimony in a May 2016 child death case that a Connecticut judge found was not credible and (2) his termination as Massachusetts's Chief Medical Examiner due to his administrative shortcomings and lack of candor with his superiors. Coleman made an offer of proof consisting of a letter from a Connecticut State's Attorney regarding a judge's finding that Dr. Flomenbaum's testimony was not credible; the transcript of that testimony; a newspaper story about Dr. Flomenbaum's termination in Massachusetts; and the Massachusetts Supreme Judicial Court's opinion affirming Dr. Flomenbaum's for-cause termination. *See Flomenbaum v. Commonwealth*, 889 N.E.2d 423 (Mass. 2008). On appeal, Coleman asserts that the court committed an abuse of discretion and violated his constitutional right to effectively cross-examine

a witness when it denied him the opportunity to further impeach Dr. Flomenbaum with evidence of these circumstances. *See* U.S. Const. amends. VI, XIV; Me. Const. art. I, § 6; M.R. Evid. 608(b).

[¶14] We afford a trial court wide discretion in its evidentiary rulings pursuant to M.R. Evid. 403 and 608(b) and review such rulings for an abuse of discretion. *State v. Maderios*, 2016 ME 155, ¶¶ 10-11, 149 A.3d 1145; *State v. Williams*, 2012 ME 63, ¶ 42, 52 A.3d 911. Rule 608(b) prohibits use of extrinsic evidence of specific instances of a witness's conduct, other than a criminal conviction pursuant to M.R. Evid. 609, to attack or support that witness's character for truthfulness but allows a court to permit "a witness's credibility [to] be attacked *through cross-examination* on specific instances of the witness's prior conduct that are probative of truthfulness or untruthfulness." *Williams*, 2012 ME 63, ¶ 42, 52 A.3d 911 (emphasis added) (citation omitted) (quotation marks omitted).

[¶15] In determining whether specific instances of a witness's conduct are sufficiently probative of the witness's character for truthfulness or untruthfulness, a court may consider (1) "the importance of the witness to the case"; (2) "how probative of truthfulness or untruthfulness the bad acts are"; and (3) "[t]he reliability of the information that the bad acts in fact

occurred . . . ." *State v. Almurshidy*, 1999 ME 97, ¶ 30, 732 A.2d 280; *see* Field & Murray, *Maine Evidence* § 608.2 at 299 (6th ed. 2007). The limited opportunity to inquire, on cross-examination, into specific acts by the witness relating to the witness's character for truthfulness or untruthfulness, however, does not open the door to the admission of extrinsic evidence relating to those acts.[3] *Almurshidy,* 1999 ME 97, ¶ 25 n.4, 732 A.2d 280 ("[P]ursuant to Rule 608(b)(1), extrinsic evidence . . . is not admissible."). Nor does the limited opportunity to inquire into specific acts on cross-examination override our well-established rule that opinion testimony on a particular witness's credibility is inadmissible. *See State v. Woodburn*, 559 A.2d 343, 346 (Me. 1989); *State v. Caulk,* 543 A.2d 1366, 1372 (Me. 1988). We now analyze each of the proffered specific instances of Dr. Flomenbaum's conduct in turn.

1) Connecticut Testimony and Judge's Credibility Determination

[¶16] We have not dealt with the admissibility pursuant to Rule 608(b) of past judicial credibility determinations concerning an expert witness. We have, however, done so in the context of expert opinions regarding another

---

[3] If a cross-examiner asks a question regarding a specific act, after satisfying the court that he has a good faith basis to ask the question, and the witness denies the act, the questioner is left with the answer and cannot offer extrinsic evidence to rebut the witness's answer. *See* Field & Murray, *Maine Evidence* § 608.2 at 299 (6th ed. 2007).

witness's credibility. *See Woodburn*, 559 A.2d at 346 (affirming the exclusion of a psychologist's expert testimony that the child victim was unable to distinguish truth from falsehood) (citing M.R. Evid. 608(a), (b)). Coleman contends that evidence of Dr. Flomenbaum's responses to a Connecticut prosecutor's questions about his termination from Massachusetts and a Connecticut judge's finding that Dr. Flomenbaum's "testimony [was] not credible" are proper subjects for impeaching Dr. Flomenbaum's credibility as a witness pursuant to Rule 608(b).

[¶17] In May 2016, Dr. Flomenbaum appeared in his personal capacity as a forensic expert at a trial in the Connecticut Superior Court on behalf of the defendant in a criminal case. Coleman asserts that if the court had allowed him, he would have asked Dr. Flomenbaum about this exchange during the State's Attorney's cross-examination in that case:

> [State's Attorney]: And you were [working for Massachusetts] for—I can't recall from your direct—how many years?
>
> [Dr. Flomenbaum]: Two years.
>
> . . . .
>
> [State's Attorney]: Two years before they fired you?
>
> [Dr. Flomenbaum]: No. Two years before I left.

[State's Attorney]: Well, didn't the [S]tate of Massachusetts terminate you, Doctor?

[Dr. Flomenbaum]: The governor did. Yes, he did.

*State v. Bumgarner-Ramos*, No. WMM-CR13-0151026-T (Conn. Super. Ct. May 11, 2016).

[¶18]  Although we have said that "falsifying testimony is . . . probative of whether someone has a truthful or untruthful character," the above exchange cannot be construed in any sense as falsification of testimony. *See Almurshidy*, 1999 ME 97, ¶ 30 n.6, 732 A.2d 280.  Dr. Flomenbaum appears to have simply disagreed with the characterization that he was fired but, more importantly, he also acknowledged—in his very next answer—that his employment was indeed terminated.  *Bumgarner-Ramos*, No. WMM-CR13-0151026-T.  Even considering Dr. Flomenbaum's importance to the State's case, this instance of his conduct completely lacks any relevance or probative value regarding his character for truthfulness.  *See State v. Ericson*, 2011 ME 28, ¶ 20, 13 A.3d 777; *Almurshidy*, 1999 ME 97, ¶ 30 n.6, 733 A.2d 280.

[¶19]  Coleman next points to the judge's finding, in the same Connecticut case, that Dr. Flomenbaum's "testimony [was] not credible and [that the court] rejects Dr. Flomenbaum's conclusions [concerning the cause

14

of death].” *Bumgarner-Ramos*, No. WMM-CR13-0151026-T (Conn. Super. Ct. May 17, 2016).  Coleman contends that this instance of Dr. Flomenbaum’s conduct is admissible impeachment evidence on the authority of *United States v. Cedeño*, where the Court of Appeals for the Second Circuit held that the defendant should have been allowed to cross-examine a government witness about a judge’s finding in a prior case that the witness had lied while testifying under oath, but ultimately concluded that this error was harmless. 644 F.3d 79, 81, 82-83 (2d Cir. 2011); *see* Fed. R. Evid. 608(b).

[¶20]  It is not clear that the Connecticut court’s finding regarding Dr. Flomenbaum’s testimony would be admissible in this case according to *Cedeño*,[4] which is distinguished from these facts by the judicial finding at issue there, i.e., a determination that the witness had *lied* under oath in a previous case.  544 F.3d at 81, 83.  Furthermore, several of the cases cited in *Cedeño* specifically differentiate between a finding that a witness had lied or was not credible and a court finding the “defense witnesses more credible than the

---

4  The Second Circuit’s approach contrasts with others that allow impeachment by inquiry into the underlying facts of a past judicial or executive branch proceeding but disallow questions about the proceeding’s conclusions or consequences, which are extrinsic evidence.  *See* Fed. R. Evid. 608(b), Advisory Committee’s Note to 2003 amend.; *United States v. Whitmore*, 384 F.3d 836, 836-37 (D.C. Cir. 2004); *United States v. Davis*, 183 F.3d 231, 256, 257 n.12 (3d Cir. 1999); *Deary v. City of Gloucester*, 9 F.3d 191, 196-97 (1st Cir. 1993); *United States v. Lopez*, 944 F.2d 33, 37-38 (1st Cir. 1991); *Waymire v. Miami Cty. Sheriff’s Office*, 2017 U.S. Dist. LEXIS 160918, at *6-7 (S.D. Ohio Sept. 29, 2017).

government's witness." *United States v. Whitmore*, 359 F.3d 609, 620 (D.C. Cir. 2004) (quotation marks omitted); *see also United States v. Dawson*, 434 F.3d 956, 959 (7th Cir. 2006) (approving of the exclusion of questions about past judicial credibility findings "when the witness . . . had been disbelieved in only one case or where it was unclear whether and why the witness's testimony had been rejected."). We need not decide whether the Second Circuit's approach should be applied in Maine in cases where the court is left with an inescapable conclusion that the witness has previously lied under oath because in Dr. Flomenbaum's case no such conclusion is possible on the facts presented here. *See Cedeño*, 644 F.3d at 81-83. The obvious conclusion to be drawn from reading the transcript of the Connecticut trial is that the judge was presented with conflicting expert opinions and elected, as typically happens, to find one credible and the other not—a far cry from finding that a witness lied.

[¶21] We note also that the overarching, bright-line rule of M.R. Evid. 608(a) prevents the admission of personal opinions regarding a witness's credibility or truthfulness. *See Woodburn*, 559 A.2d at 346. The Connecticut judge's opinion of Dr. Flomenbaum's testimony is just the sort of opinion evidence prohibited by Rule 608(a). The court acted well within its

16

discretion to preclude Coleman's inquiry on cross-examination into Dr. Flomenbaum's testimony and the judge's finding on the credibility issue in the Connecticut case. *See id.*; *Caulk,* 543 A.2d at 1372.

2) Dr. Flomenbaum's Prior Employment Termination

[¶22]   Coleman next argues that the reasons for Dr. Flomenbaum's removal as Massachusetts Chief Medical Examiner—that according to the Massachusetts Supreme Judicial Court decision included his administrative shortcomings and lack of candor with his superiors[5]—are also specific instances of Dr. Flomenbaum's conduct that are probative of his character for truthfulness.   Coleman postulates that Dr. Flomenbaum's termination from his prior employment may provide a motive or bias on Dr. Flomenbaum's part to please the Attorney General's Office and thereby secure his continued employment in Maine's Office of the Chief Medical Examiner, which is a division within the Office of the Attorney General.   Coleman contends that, "[g]iven the importance of Dr. Flomenbaum, his testimony, and his credibility," this bias was another proper avenue for cross-examination and

---

[5]   The Massachusetts decision cited actions by Dr. Flomenbaum including his delayed reporting of a missing body and underestimation of the backlog of bodies awaiting autopsies. *Flomenbaum v. Commonwealth*, 889 N.E.2d 423, 430-31 (Mass. 2008).

that the court abused its discretion by excluding this impeachment evidence pursuant to M.R. Evid. 401 and 403.

[¶23] If Dr. Flomenbaum's administrative capabilities are relevant to his collection and supervision of the sexual assault kit evidence, then it was error for the court to exclude this impeachment evidence unless its probative value was substantially outweighed by the risks of unfair prejudice or confusion of the jury and the issues before it. M.R. Evid. 401, 403. The State sought to qualify Dr. Flomenbaum as an expert when it inquired about his education, experience, and the number of autopsies he had performed. In response, Dr. Flomenbaum provided a summary of his medical training and employment history, including his time as Massachusetts Chief Medical Examiner, and an estimate that he had conducted 3,000 to 4,000 autopsies. At the time Dr. Flomenbaum conducted the daughter's autopsy, he was Maine's Chief Medical Examiner and he supervised or personally undertook the collection of the sexual assault kit and the other evidence from the daughter's autopsy.

[¶24] Evidence of Dr. Flomenbaum's administrative shortcomings and lack of candor with his superiors when he was the Chief Medical Examiner in another state are relevant to his performance of his administrative duties as

the State of Maine's Chief Medical Examiner, contrary to the trial court's findings. *See United States v. York*, 933 F.2d 1343, 1365-66 (7th Cir. 1991) (affirming expert medical doctor's impeachment with questioning about his allegedly unprofessional conduct at his previous position as Chief Medical Examiner), *overruled on other grounds by Wilson v. Williams*, 182 F.3d 562 (7th Cir. 1999). Additionally, the circumstances of Dr. Flomenbaum's termination are directly relevant to an aspect of his professional credentials that the State used to qualify Dr. Flomenbaum as an expert in this case. *See id.*; *Maderios*, 2016 ME 155, ¶¶ 10-11, 149 A.3d 1145; *State v. Filler*, 2010 ME 90, ¶¶ 17-20, 3 A.3d 365 ("[E]vidence tending to impeach [the State's primary witness's] credibility has greatly enhanced probative value." (quotation marks omitted)). In establishing Dr. Flomenbaum's expert credentials, the State included the fact that he had previously held a prestigious position—a fact that may be properly tempered by the fact of his involuntary removal from that position.

[¶25] We must next decide whether the court's error in limiting cross-examination of a state's witness was harmless based upon "'the importance of the witness'[s] testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating

or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *State v. Johnson*, 2009 ME 103, ¶ 18, 982 A.2d 320 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)). In this case, Dr. Flomenbaum's testimony was just one of many pieces of evidence presented at trial. In addition to that evidence, the court heard testimony from the detectives who recounted Coleman's confession to the murders; the family members and first responders who established that, of the three victims, only the daughter was found gagged and straddling the end corner of a bed, thus supporting in part a finding that she was sexually assaulted; and two forensic analysts from the crime laboratory who corroborated Dr. Flomenbaum's testimony by positively identifying blood and semen on the sexual assault kit samples, as well as matching Coleman's DNA with that in the sperm found on the daughter and with the DNA found on one of the ligatures. We conclude that the court's error was harmless, in part, because despite Dr. Flomenbaum's importance to the State's case on the gross sexual assault charge, the State presented significant circumstantial evidence to corroborate that the blood and semen evidence Dr. Flomenbaum collected was as he characterized it in his testimony. In addition, Coleman was able to

cross-examine Dr. Flomenbaum generally as to his credibility and alleged bias in favor of the State, which decreased any prejudice resulting from the lack of cross-examination regarding the Massachusetts termination.[6]   The above factors along with the other circumstantial evidence and "the record as a whole demonstrate[ ] beyond a reasonable doubt that the error did not affect the substantial rights of the defendant or contribute to the verdict obtained." *State v. Norwood*, 2014 ME 97, ¶ 14, 97 A.3d 613; *Johnson*, 2009 ME 103, ¶ 18, 982 A.2d 320.

[¶26]   In sum, we conclude that the circumstances surrounding Dr. Flomenbaum's termination from his employment in Massachusetts due to his administrative shortcomings and lack of candor are arguably probative of his ability to supervise and process the taking of forensic samples and could have tempered the jury's view of his administrative skill and candor in his work in Maine.  *See York*, 933 F.2d at 1365-66; *Filler*, 2010 ME 90, ¶¶ 17-20, 3 A.3d 365.   Although the court erred by finding that this impeachment evidence was not at all relevant in this case and by precluding any related

---

[6]   Coleman's cross-examination of Dr. Flomenbaum, while not as extensive as he wished, satisfied his right to confront an adverse witness.  The Confrontation Clause guarantees an adequate and effective, but not unlimited, cross-examination, and the court's error in limiting this questioning did not rise to a deprivation of Coleman's constitutional right.  *See State v. Johnson,* 2009 ME 103, ¶ 15, 982 A.2d 320; *State v. Brown*, 321 A.2d 478, 485 (Me. 1974).

questioning, those errors were harmless in the face of the overwhelming evidence of Coleman's guilt.[7]

B.      Prosecutorial Misconduct

[¶27]   We review preserved claims of prosecutorial misconduct for harmless error.  *State v. Pillsbury*, 2017 ME 92, ¶ 18, 161 A.3d 690; *State v. Dolloff*, 2012 ME 130, ¶¶ 31-34, 58 A.3d 1032.  According to this standard, we disregard "[a]ny error, defect, irregularity, or variance that does not affect substantial rights."   M.R.U. Crim. P. 52(a).  Coleman complains about the State's opening statement that evidence from "vaginal swabs" would show "sperm found on a young girl's vagina" because he claims that the swabs should have been referred to as "external genitalia" swabs, in keeping with the sexual assault kit's protocol.  Several witnesses for the State testified that sexual assault kits indeed have separate envelopes and instructions for "vaginal swabs," used for internal vaginal collections, and for collections from "external genitalia."   Dr. Flomenbaum testified that he labeled the sexual

---

[7]  Coleman correctly notes that he did not confess to the sexual assault charge, on which it was the State's burden to prove beyond a reasonable doubt that genital-to-genital contact occurred. *See infra* ¶¶ 29-30.  Dr. Flomenbaum's testimony provided support for such a finding.  Specifically, Dr. Flomenbaum testified that the daughter was gagged; that she had blunt force trauma to her face; that the abrasions on her buttocks and blood around her vagina and in the crotch of her shorts suggested that she was alive when the abrasions occurred; and he concluded that her intact hymen ruled out penetrative sex but not necessarily direct genital contact.  Neither Coleman nor the Massachusetts termination proceedings challenged Dr. Flomenbaum's forensic abilities in performing autopsies and reporting his findings.

22

assault kit swabs, taken from the daughter's "vaginal area" between the labia majora and minora, as vaginal swabs.

[¶28]  The State used these terms in its opening statement, as the Chief Medical Examiner did, to accurately describe where the evidence of a sexual act was found—inside the labia majora and external to the hymen, not from deeper within the victim's vagina, as Coleman claims the prosecutor said.[8] The State's opening statement, which was preceded and followed by the court's admonitions that the opening statements were not evidence, was free of any misconduct and was "fairly based on the facts [anticipated] in evidence."  *State v. Cote*, 2017 ME 73, ¶ 27, 159 A.3d 831 (quotation marks omitted); *State v. Lockhart*, 2003 ME 108, ¶¶ 47-49, 830 A.2d 433.

C.      Sufficiency of the Evidence of Gross Sexual Assault

[¶29]  Next, Coleman contends that there was insufficient evidence supporting his conviction for gross sexual assault, namely that there was not proof beyond a reasonable doubt of direct genital-to-genital contact or proof that the victim was alive at the time that such contact occurred. *See* 17-A M.R.S. §§ 251(1)(C), 253(1)(C), 508 (2017).  We review a challenge that there is insufficient evidence to support the jury's verdict by viewing all

---

[8]  The forensic evidence indicated that the semen was found between the labia majora and minora, external to the intact hymen.

the evidence and reasonable inferences drawn therefrom in the light most favorable to the State.  *See State v. Diana*, 2014 ME 45, ¶ 2, 89 A.3d 132; *State v. Skarbinski*, 2011 ME 65, ¶ 6, 21 A.3d 86.

[¶30]  Section 253(1)(C) requires, in this case, proof of a sexual act, in the form of direct genital-to-genital contact, with a person who was not Coleman's spouse and who had not reached twelve years of age.  Coleman concedes that the daughter was unmarried and under twelve years old.  We have repeatedly said that "[a] criminal conviction may be based solely on circumstantial evidence . . . as long as the evidence supports a finding that each element of the crime is proved beyond a reasonable doubt."  *State v. Moores*, 2009 ME 102, ¶ 10, 982 A.2d 318; *see also State v. Cheney*, 2012 ME 119, ¶ 42, 55 A.3d 473.  Despite the lack of direct evidence of how Coleman's semen was deposited on the victim's genitalia, the jury could have rationally inferred, beyond a reasonable doubt, that a sexual act (i.e., genital-to-genital contact) had occurred while the victim was alive based on the circumstantial evidence

24

presented at trial. *See* 17-A M.R.S. § 251(1)(C); *State v. Poblete*, 2010 ME 37, ¶ 30, 993 A.2d 1104; *State v. Chad B.*, 1998 ME 150, ¶¶ 7-8, 715 A.2d 144.

D.     Chain of Custody of the Sexual Assault Kit

[¶31]   Coleman next asserts that the court erred by finding that the State had established a proper chain of custody of the sexual assault kit, which was stored under unknown conditions at the Medical Examiner's Office from the afternoon of December 22 until 10:00 a.m. on December 24, 2014. We review for clear error a finding that an item of physical evidence has been authenticated by a sufficient chain of custody. *Diana*, 2014 ME 45, ¶¶ 26-27, 89 A.3d 132; *see* M.R. Evid. 901(a). A chain of custody "need [not] be ironclad," and "a minor break goes to the weight of the evidence rather than its admissibility." *Diana,* 2014 ME 45, ¶ 26, 89 A.3d 132 (alteration in original) (quotation marks omitted) (quoting Field & Murray, *Maine Evidence* § 901.3 at 543). The sexual assault kit samples were sealed and consistently in the custody of the Maine State Police, the Medical Examiner's Office, and then the crime laboratory, before finally returning to the Maine State Police's evidence locker. The court did not clearly err or otherwise abuse its discretion in admitting the sexual assault kit in evidence because the State

accounted for the kit's location and sealed condition at all relevant times. *See id.*

E.      Sentencing

[¶32] Coleman finally argues for the first time on appeal that we should adopt a clear and convincing standard of proof for aggravating factors considered at sentencing. He contends that the sentencing court abused its discretion in considering as aggravating factors, upon a less than clear and convincing quantum of proof, his prior domestic violence against the mother and the victims' conscious fear and suffering. Where a challenge to the court's application of a standard of proof at sentencing is unpreserved, we review the court's actions for obvious error. *See State v. Butsitsi*, 2015 ME 74, ¶¶ 19, 22, 118 A.3d 222; *State v. Schofield*, 2005 ME 82, ¶ 28, 895 A.2d 927. As Coleman acknowledged in his brief, we have instructed sentencing courts to consider any "reliable and relevant" evidence of mitigating or aggravating factors. *State v. Waterman*, 2010 ME 45, ¶ 48, 995 A.2d 243. This is precisely what the court did in Coleman's case, and we decline to announce a new standard.

[¶33] Considering the sentence that the court imposed, we review the court's application of the first step of the sentencing analysis—the determination of a basic sentence—de novo and we review the court's second

step of the analysis—the determination of the final sentence—for an abuse of discretion. 17-A M.R.S. §§ 1201(1)(A), 1252-C (2017); *Waterman*, 2010 ME 45, ¶ 42, 995 A.2d 243; *State v. Cookson*, 2003 ME 136, ¶ 38, 837 A.2d 101. Here the court found the existence of several aggravating factors justifying a life sentence: (1) multiple deaths, (2) a murder committed in the presence of a child, (3) a murder accompanied by sexual assault, and (4) the domestic violence nature of the murders.[9] *See Waterman*, 2010 ME 45, ¶ 45, 995 A.2d 243; *State v. Shortsleeves*, 580 A.2d 145, 149-50 (Me. 1990). On balance, the court determined that the mitigating circumstances[10] were greatly outweighed by those and additional aggravating factors, including Coleman's clear mind, free from the influence of any substances, at the time of the crimes; the impact of the victims' deaths on their family and community; Coleman's prior acts of domestic violence; the victims' conscious suffering and fear; and Coleman's lack of remorse and consciousness of guilt in his confession. *See State v. Hamel*, 2013 ME 16, ¶ 6, 60 A.3d 783; *Schofield*,

---

[9] The court also found that the cause of the deaths by strangulation was an aggravating factor for sentencing purposes. Although not specifically listed among the *Shortsleeves* factors, strangulation has been cited in other life sentence cases. *See State v. Dwyer*, 2009 ME 127, ¶ 38, 985 A.2d 469; *State v. Wilson*, 669 A.2d 766, 767-69 (Me. 1996).

[10] The sentencing court found the following mitigating factors: Coleman's age at the time of the crime, his history of substance abuse and mental health issues, his lack of a significant criminal record, the absence of premeditation, the evidence that he has family and friends that love him, and the terrible circumstances of his childhood.

2006 ME 101, ¶ 14, 904 A.2d 409; *Cookson*, 2003 ME 136, ¶¶ 39-41, 837 A.2d 101; *Shortsleeves,* 580 A.2d at 150-51. Coleman's challenge to his final sentence, attacking just two of the several aggravating factors, is unpersuasive, and the court acted well within its discretion in arriving at a maximum sentence of life imprisonment on the murder counts.

The entry is:

Judgment and sentences affirmed.

---

Jeremy Pratt, Esq. (orally), and Ellen Simmons, Esq., Camden, and Logan E. Perkins, Esq., Perkins Law Office, Belfast, for appellant Keith Coleman

Janet T. Mills, Attorney General, and Donald W. Macomber, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2014-4662
FOR CLERK REFERENCE ONLY