MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2020 ME 61
Docket:       Lin-19-293
Submitted
  On Briefs:  April 14, 2020
Decided:      May 12, 2020

Panel:        GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

STATE OF MAINE

v.

SHAWNA GATTO

JABAR, J.

[¶1]  Shawna Gatto appeals from a judgment of conviction of murder, 17-A M.R.S. § 201(1)(B) (2020), entered by the trial court (Lincoln County, *Stokes, J.*) following a jury-waived trial.  Gatto contends that the trial court erred in finding her guilty of murder pursuant to 17-A M.R.S. § 201(1)(B) because the State did not present sufficient evidence such that the fact-finder could have found each element proved beyond a reasonable doubt.  Gatto also argues that the trial court erred and abused its discretion when it limited her cross-examination of the State's Chief Medical Examiner.  We affirm the judgment.

## I. BACKGROUND

A.    Facts

[¶2]  Viewing the evidence in the light most favorable to the State, the fact-finder could have found the following facts beyond a reasonable doubt. *State v. Cummings*, 2017 ME 143, ¶ 3, 166 A.3d 996.  In December 2017 Gatto was forty-three years old and living in Wiscasset.  She lived in a mobile home with her fiancé and her fiancé's four-year-old granddaughter, the victim.

[¶3]  Gatto and her fiancé cared for the victim full-time, and had done so for more than two years.  Gatto also provided daily childcare for her two biological grandchildren.  Gatto's fiancé worked full-time at Bath Iron Works. On the days he worked, he left the house around 6:00 a.m. and returned around 3:30 p.m.

[¶4]  On December 8, 2017, Gatto's fiancé arrived home from work at approximately 3:25 p.m.  When he entered the house, Gatto's grandchildren were in the living room and Gatto was in the kitchen.  Gatto told her fiancé that the victim was in the tub because she had soiled herself, and directed him not to go into the bathroom because the victim was in timeout.  After working in his bedroom for a few minutes, Gatto's fiancé left the house to go to the hardware

store.  At 4:28 p.m., before he left the property, Gatto called him and told him to come back to the house because something was wrong with the victim.

[¶5]  Gatto's fiancé reentered the house and went to the back bathroom.[1] He found the victim lying motionless and naked on the bathroom floor.  He moved the victim to the living room and began performing CPR.  Gatto's fiancé suggested that someone needed to call 911, and then moved the victim again, this time to the master bathroom, where he continued performing CPR.

[¶6]  At 4:35 p.m., Gatto's fiancé called 911, telling the dispatcher that the victim was unresponsive.  The dispatcher spoke to Gatto and to Gatto's fiancé, and instructed them in performing CPR.  Emergency responders arrived a few minutes later.  When they entered the house, they found Gatto's fiancé performing CPR on the victim in the master bathroom.  The first responders found the victim cold to the touch.  Her face was heavily bruised, and her head was misshapen and swollen.  The first responders transported her to the hospital, where she was declared dead at 5:43 p.m.  Neither the first responders

---

[1]  The mobile home where Gatto lived had two bedrooms and two bathrooms.  One end of the home held the bedroom where the children slept, along with a small bathroom (the children's bathroom).  This small bathroom was where Gatto's fiancé first found the victim.  The other end of the home held the master bedroom and bathroom.  This master bathroom was where Gatto's fiancé eventually brought the victim to perform CPR and where first responders found the victim.

4

nor the emergency room physicians ever detected any signs of life from the victim.

[¶7]  Gatto gave several statements to law enforcement regarding the victim's injuries.  While on the phone with the 911 dispatcher, Gatto said that the victim had fallen two days ago but was "fine" just ten minutes before she found her unresponsive in the tub.  After the victim was transported to the hospital, Gatto rode with a detective to the Lincoln County Sheriff's Department.  She told the detective that the victim was very accident prone, fell often, and did not protect herself when she fell.  She also claimed that the victim had been perfectly happy and active all during that day, and again stated that the victim was fine just moments before Gatto found her in the tub.

[¶8]  Later that evening, a Maine State Police detective interviewed Gatto at the Lincoln County Sheriff's Department.  Asked to describe the victim, Gatto painted a picture of an injury-prone child whose clumsiness and lack of any self-protective instincts led to bumps, bruises, and cuts on a daily basis.  Gatto listed several recent instances in which the victim had serious falls that resulted in black eyes, cuts, and bruises.  The detective asked Gatto to describe what happened on December 8.  According to Gatto, the victim had soiled herself, which she said was a common occurrence, and Gatto had put her in the tub

without water. Gatto said that she went to fetch the victim a drink and returned moments later to find the victim unresponsive in the tub.

[¶9] Late on the night of December 8, detectives with the Maine State Police searched Gatto's home pursuant to a search warrant. In the child's bathroom they found evidence of blood and signs of an attempt to clean up the blood. They identified blood stains on a sponge and shirt in the tub, on paper towels in a trash bag, on towels and bedding, and on a set of child's pajamas found soaking in a bucket of water. Detectives noticed a dent in the drywall of the back bedroom in the shape of a child's head, stained with blood and embedded with hair. The hair belonged to the victim.[2]

[¶10] The State of Maine's Chief Medical Examiner, Mark Flomenbaum, M.D., conducted an autopsy of the victim's body. He documented at least fifteen injuries to the victim's head and face, including serious bruises and deep lacerations. He found that the victim was very small for her age, with patchy, thin hair. He also determined that although her skull was not fractured, she had a significant accumulation of blood under her scalp and a buildup of scar tissue from a head injury. Her brain had swollen due to oxygen deprivation. He opined that the victim suffered from Child Abuse Syndrome and had sustained

---

[2] Detectives also identified the victim's blood on objects throughout the bedroom and bathroom.

numerous nonfatal injuries that contributed to her death from a separate, ultimately-fatal injury.

[¶11]   The autopsy also revealed that the victim's abdomen was distended, but did not show bruises or other external signs of injuries. Dr. Flomenbaum concluded that internal injuries resulted in internal bleeding, and that about one-third of the victim's blood had accumulated in her abdominal cavity, along with gastric contents.  Her intestines were torn and her pancreas lacerated.  The loss of blood had caused her brain to be starved for oxygen and swell, and eventually caused her heart to stop.[3]

[¶12]   The Maine State Police detective interviewed Gatto again on December 10.  Gatto repeated her story regarding her final minutes with the victim.  She explained the victim's many bruises and injuries with a litany of stories about the victim's clumsiness and frequent falls, but reported that she never felt a need to take the victim to a doctor.  She denied inflicting any of the victim's injuries.

---

[3] Dr. Flomenbaum and John Daniel, M.D., a pathologist called by Gatto as an expert witness, agreed as to the nature of the victim's injuries and the manner and cause of death.  They disagreed, however, on the timing of her internal injuries relative to her death.  Dr. Flomenbaum testified that the victim's internal injuries were inflicted between one and twelve hours prior to her death, and that they most likely occurred between three and six hours prior to death.  Dr. Daniel disagreed, testifying that the victim's abdominal injuries—the fatal injuries—were likely inflicted between sixteen and thirty-two hours, and perhaps has much as three days, before she died.

B.     Procedure

[¶13]  On January 13, 2018, a Lincoln County grand jury indicted Gatto on one count of murder, 17-A M.R.S. § 201(1)(B).  Gatto pleaded not guilty and waived her right to a jury trial.  M.R.U. Crim. P. 23(a).  On July 13, 2018, Gatto moved in limine to be permitted to cross-examine Dr. Flomenbaum regarding his termination from the Office of the Chief Medical Examiner in Massachusetts, and to be permitted to introduce extrinsic evidence regarding Dr. Flomenbaum's termination if the need arose.  The trial court took the motion under advisement, but deferred ruling until the matter was closer to trial.  The trial court held a five-day trial between April 1 and April 8, 2019.  After the State completed its direct examination of Dr. Flomenbaum, the court heard argument from the parties regarding Gatto's motion in limine and subsequently denied the motion.

[¶14]  On April 30, 2019, the trial court returned its verdict, finding Gatto guilty of depraved indifference murder pursuant to 17-A M.R.S. § 201(1)(B). The court later sentenced Gatto to fifty years' imprisonment.  Gatto timely appealed from the judgment of conviction.[4]  M.R. App. P. 2B(b)(1).

---

[4]  Gatto applied for review of her sentence.  M.R. App. P. 20(a)(1).  The Sentence Review Panel denied her application for sentence review.  M.R. App. P. 20(f); 15 M.R.S. § 25152 (2020); *State v. Gatto*, No. SRP-19-294 (Me. Sent. Rev. Panel Sept. 5, 2019).

## II. DISCUSSION

### A.     Sufficiency of the Evidence

[¶15]  Gatto contends that the trial court erred in finding her guilty of murder as defined in 17-A M.R.S. § 201(1)(B) because the State did not present sufficient evidence to support the fact-finder's determination that the State had proved each element beyond a reasonable doubt.  Specifically, Gatto argues that the trial court could not have found her guilty without direct evidence linking her conduct to the infliction of the victim's fatal injury.  Contrary to her contentions, however, the record evidence is sufficient to support the court's findings, even absent direct evidence that Gatto inflicted the fatal injury.  *See Cummings*, 2017 ME 143, ¶ 14, 166 A.3d 996 (holding that reasonable inferences based on circumstantial and DNA evidence may be sufficient to affirm a conviction for murder).

#### 1.     Legal standard

[¶16]  "When reviewing a judgment for sufficiency of the evidence, we view the evidence in the light most favorable to the State to determine whether the fact-finder could rationally have found each element of the offense beyond a reasonable doubt."  *Id.* ¶ 12 (alterations omitted) (quotation marks omitted).  "We defer to all credibility determinations and reasonable inferences drawn by

the fact-finder, even if those inferences are contradicted by parts of the direct evidence." *Id.* (quotation marks omitted).

[¶17] A person is guilty of depraved indifference murder if the person "engages in conduct that manifests a depraved indifference to the value of human life and that in fact causes the death of another human being." 17-A M.R.S. § 201(1)(B). "A person acts with depraved indifference to the value of human life in Maine if the person's conduct, objectively viewed, created such a high tendency to produce death that the law attributes to him the highest degree of blameworthiness."[5] *Cummings*, 2017 ME 143, ¶ 16, 166 A.3d 996 (quotation marks omitted). The State must prove both that the defendant "should have known [her conduct] would create a very high degree of risk of death or serious bodily injury" and that the conduct was "particularly outrageous, revolting, brutal, or shocking." *State v. Crocker*, 435 A.2d 58, 63, 65 (Me. 1981) (quotation marks omitted).

2. Evidence that Gatto Caused the Victim's Death

[¶18] In its written decision, the trial court divided its analysis into two discrete issues: first, whether Gatto in fact caused the victim's death; and

---

[5] We have interpreted Maine's statute defining depraved indifference murder not to require any culpable mental state on the part of the defendant. *Cummings*, 2017 ME 143, ¶ 19, 166 A.3d 996; *State v. Lagasse*, 410 A.2d 537, 540 (Me. 1980).

second, whether Gatto engaged in conduct that, viewed objectively, manifested a depraved indifference to the value of human life.

[¶19] In its detailed and lengthy analysis, the trial court acknowledged the possibility that someone other than Gatto, specifically Gatto's fiancé, caused the victim's fatal injuries. The trial court ultimately discounted this theory, concluding that it was Gatto who killed the victim. The record evidence, viewed in the light most favorable to the State, fully supports the trial court's finding that Gatto caused the victim's death.

[¶20] Both Gatto and her fiancé cared for the child, but Gatto provided the vast majority of the childcare. Gatto did not actually suggest to the court that her fiancé might have hurt the victim, and that possibility is all but foreclosed by the fact that Gatto claims to have been personally present every time the victim allegedly injured herself. Her detailed, if implausible, explanations for each and every bruise and cut on the victim's battered body do not square with a conclusion that the victim's injuries actually stemmed from abuse inflicted by Gatto's fiancé. The trial court was entitled to reject Gatto's alternative explanations for the victim's injuries. *See State v. Saenz,* 2016 ME 159, ¶ 24, 150 A.3d 331 (holding that the record contained sufficient evidence

to support a conviction for depraved indifference murder where defendant argued that victim's injuries were accidental and self-inflicted).

[¶21] The record evidence does not support Gatto's assertions that the victim's injuries were all accidental and self-inflicted. The expert witnesses agreed that the victim was an abused child and that her fatal abdominal injuries were inflicted by some sort of massive squeezing pressure. Gatto's behavior prior to the victim's death suggests that she recognized the absurdity of her explanations for the victim's appearance—she and her fiancé were reticent to take the victim out in public for fear that someone would recognize the obvious signs of abuse. The trial court concluded that the testimony of Gatto's fiancé was credible, but found Gatto's statements to police regarding the victim "utterly unworthy of belief." Because the court reasonably concluded that Gatto was the only person who hurt the victim, it was unnecessary to resolve the dispute regarding the timing of the fatal injury relative to the victim's death— whenever the injury was inflicted, it was inflicted by Gatto.

3.    Evidence that Gatto Acted with Depraved Indifference

[¶22] Ample record evidence supports the trial court's finding that Gatto engaged in conduct that created a very high degree of risk of serious bodily injury or death. *See Crocker*, 435 A.2d at 63, 65. Evidence of the long period of

12

abuse supports this conclusion, as does evidence of the mechanism of the victim's fatal injury. The forensic evidence suggests that Gatto imposed an extremely high level of violence on the victim over the course of weeks or months. This evidence includes a head-shaped dent in the wall that was impregnated with the victim's hair and blood; blood spatter evidence throughout the victim's bedroom; deep bruising all over the victim's face and body; evidence of hemorrhaging under the victim's scalp; and signs of chronic stress in the victim's brain. The degree of violence imposed and the physical characteristics of the victim support the conclusion that Gatto knew or should have known that her conduct carried with it a very high risk of serious bodily injury or death. *See Crocker*, 435 A.2d at 63, 65.

[¶23] Furthermore, the mechanism by which the victim's fatal injuries were inflicted support a similar conclusion. The expert witnesses agreed that a very strong squeezing action caused the victim's pancreas to be pushed against her spine and lacerate. The trial court was found that this injury was purposely inflicted, not accidental, and the forensic evidence demonstrates that such an injury could be caused only by a slow and concerted application of force and that such application of force was sure to involve a high degree of risk of bodily injury.

[¶24] Finally, record evidence underpins the trial court's finding that Gatto's death-producing conduct was "outrageous, revolting, shocking, and brutal." *Crocker*, 435 A.2d at 65. The duration of the abuse, its violence, the helplessness of the child, and Gatto's denial of medical attention to the victim were properly characterized by the trial court as "cruel" and as constituting "torture."

[¶25] Viewing the evidence in the light most favorable to the State, and deferring to the trial court's reasonable inferences and determinations of witness credibility, the record is sufficient to support the trial court's conclusion that the State had proved all elements of depraved indifference murder beyond a reasonable doubt. *See Cummings*, 2017 ME 143, ¶ 12, 166 A.3d 996. The law does not compel a judgment of acquittal, as Gatto contends, where the State does not present direct evidence that the defendant caused the victim's fatal injury. *See id.* ¶ 14. The trial court was entitled to rely on the overwhelming circumstantial evidence in making its findings. *Id*.

B.     Limitation of Cross-Examination

[¶26] Gatto argues that the trial court erred and abused its discretion when it limited her cross-examination of Dr. Flomenbaum, specifically by precluding her from asking about his removal from the Office of the Chief

14

Medical Examiner in Massachusetts.[6] She contends that this evidence was probative of his character for truthfulness, necessary to challenge his qualification as an expert witness,[7] and relevant to show bias.

1.      Character for Untruthfulness

[¶27] The factors that guide a trial court's analysis of proffered evidence under Rule 608(b), which governs the admissibility of specific instances of a witness's conduct to attack or support the witness's character for truthfulness, do not compel a conclusion that the evidence at issue should have been admitted, and do not support a conclusion that the trial court abused its discretion. M.R. Evid. 608(b); *Haji-Hassan*, 2018 ME 42, ¶ 14, 182 A.3d 145. We have noted that the decision to admit evidence of Dr. Flomenbaum's prior removal is to be made based on the individual factors present in each case:

---

[6] We have considered several appeals regarding the extent to which criminal defendants may be permitted to impeach Dr. Flomenbaum regarding his prior removal from employment. *See State v. Haji-Hassan*, 2018 ME 42, ¶¶ 13-24, 182 A.3d 145; *State v. Coleman*, 2018 ME 41, ¶¶ 22-26, 181 A.3d 689. We have also considered whether a criminal defendant may cross-examine Dr. Flomenbaum regarding a Connecticut matter in which a trial judge found Dr. Flomenbaum's expert testimony not to be credible. *See Coleman*, 2018 ME 41, ¶¶ 16-21, 181 A.3d 689. Gatto did not seek to introduce evidence or to cross-examine Dr. Flomenbaum regarding the Connecticut matter.

[7] Gatto argues for the first time on appeal that evidence of Flomenbaum's firing in Massachusetts was also relevant to challenge his credentials as an expert witness, pointing in particular to *Coleman*, 2018 ME 41, ¶ 24, 181 A.3d 689. However, the trial court correctly distinguished the facts of this case from those of *Coleman*, at least with regard to the issue of the foundation for Flomenbaum's qualification as an expert witness. The trial court did not commit obvious error in not admitting this evidence on these grounds. *See State v. Fahnley*, 2015 ME 82, ¶ 15, 119 A.3d 727 (stating that unpreserved claims of error are reviewed for obvious error).

> This is properly a case-by-case determination, and we announce no blanket rule on the admissibility of this evidence in other cases. The trial courts must exercise their discretion in the particularized context of each case to admit or exclude such evidence after evaluating the extent of any relevance it may have, and, if it is deemed relevant, weighing its probative value against the dangers listed in Rule 403.

*Haji-Hassan*, 2018 ME 42, ¶ 24, 182 A.3d 145. Although Gatto's offer of proof put forth a colorable argument that the line of questioning could be probative of truthfulness, the trial court properly considered the countervailing factors that pointed toward exclusion. The trial court expressed concern that the cross-examination would not actually elicit evidence of specific instances of conduct. *Id.* ¶ 21 ("[L]ack of candor and failure to communicate fully and frankly are not specific instances of untruthful *conduct*, but are more akin to extrinsic opinions of a third party . . . ." (quotation marks omitted)). The trial court also worried that this line of questioning would devolve into a "retrial of the removal case" that would waste significant time with no attendant benefit. Because the proffered evidence did not fit within Rule 608(b)'s definition of specific instances of conduct, risked wasting time, and was arguably of limited probative value, the trial court did not abuse its discretion in declining to admit this evidence pursuant to Rule 608(b).

2.      Bias

[¶28]   In addition to her argument that she should be permitted to cross-examine Dr. Flomenbaum under Rule 608(b) regarding his prior removal, Gatto also argued at trial that the evidence was admissible because it tended to show bias or prejudice.  Because Dr. Flomenbaum had been removed from his job in Massachusetts, Gatto argued, he held his current position more dearly, and would be willing to offer evidence favorable to the State in order to avoid another such removal.

[¶29]  "Evidence of bias, hostility and personal interest of a witness may be shown by the introduction of independent evidence to that effect, and is not limited to cross-examination of the witness, and no preliminary foundation need be laid for its admissibility."  *State v. Doughty*, 399 A.2d 1319, 1324 (Me. 1979).  Despite this broad and general rule, we have previously opined that evidence of Dr. Flomenbaum's removal does not tend to show bias:

> The connection between Dr. Flomenbaum's removal and his alleged bias in favor of the State of Maine to maintain his current employment is speculative at best, and its probative value, if any, is slight.  The evidence is no more probative of bias than the fact, taken alone, that he is currently employed by the State.

*Haji-Hassan*, 2018 ME 42, ¶ 21, 182 A.3d 145.  Given the deferential standard of review applied to determinations of admissibility, the minimal probative value

of the evidence, and the trial court's thorough knowledge of the circumstances of Dr. Flomenbaum's prior removal, the trial court did not abuse its discretion in declining to allow Gatto to pursue this line of questioning to show bias.

## III. CONCLUSION

[¶30] Viewing the evidence in the light most favorable to the State, the record is sufficient to support the trial court's conclusion that the State had proved all elements of depraved indifference murder beyond a reasonable doubt. *Cummings*, 2017 ME 143, ¶ 12, 166 A.3d 996. Furthermore, the trial court did not abuse its discretion in limiting Gatto's cross-examination of Dr. Flomenbaum.

The entry is:

Judgment affirmed.

---

Jeremy Pratt, Esq., and Ellen Simmons, Esq., Camden, for appellant Shawna Gatto

Aaron M. Frey, Attorney General, and Donald W. Macomber, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

Lincoln County Unified Criminal Docket docket number CR-2017-877
FOR CLERK REFERENCE ONLY